## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**IRINA CHULSKY,**

      **Plaintiff,**

             **v.**

**GOLDEN CORRAL
CORPORATION, et al.,**

      **Defendants.**

                    **Case No. 1:19-cv-875
                    JUDGE DOUGLAS R. COLE**

### <u>OPINION AND ORDER</u>

This cause comes before the Court on Defendant Kurt Parry's Motion to Dismiss ("Mot.") (Doc. 18), which asks the Court to dismiss Plaintiff Irina Chulsky's Complaint (Doc. 1) as to Parry for lack of personal jurisdiction, failure to state a claim, and insufficiency of service of process. For the reasons discussed below, the Court concludes that it has personal jurisdiction over Parry, and that the delay in service should not prevent this matter from moving forward. However, the Court **GRANTS** Parry's Motion (Doc. 18) on the grounds that the Complaint fails to state a claim, and accordingly **DISMISSES** Chulsky's Complaint (Doc. 1) as to Parry, but does so **WITHOUT PREJUDICE**.

## BACKGROUND[1]

Plaintiff Irina Chulsky began working for Golden Corral, a buffet-style restaurant, in 2006. (Compl., Doc. 1, #4[2]). In 2013, Golden Corral promoted Chulsky to kitchen manager and transferred her to its Eastgate, Ohio location. (*Id.*). Around October 2016, Chulsky met Defendant Kurt Parry at the Eastgate Golden Corral when Parry, then working for Golden Corral as a Quality Assurance Director, visited to inspect the Eastgate facility. (*Id.*). Chulsky alleges that Parry returned to the Eastgate location on subsequent occasions for "business purposes," and spent time speaking with Chulsky on each such occasion. (*Id.*). Chulsky further alleges that, on at least one occasion, Parry visited the Eastgate location for "no discernable official or business reason," and made clear that he was there only to speak with Chulsky. (*Id.*). He later invited her to join him for dinner via Facebook. (*Id.*).

Their relationship thereafter "developed." (*Id.*). Chulsky alleges that the two corresponded regularly, and that Parry began to "mentor her and provide her with insider information" about personnel matters and promotional opportunities at Golden Corral. (*Id.*). According to Chulsky, what she believed was a business relationship became something else when Parry began sending her "notes, gifts, and photographs of himself." (*Id.*). While she attempted to ignore his advances in the

---

[1] As further described below, for purposes of motions under Rule 12, the Court accepts as true the factual allegations in the Complaint. In connection with the challenges to jurisdiction or service of process, the Court reviews any affidavits that Parry submitted, but construes those affidavits in the light most favorable to Chulsky. Thus, the Court reports the background here on the basis of the aggregate "facts" that it gleaned from those sources, but with the disclaimer that these facts are not yet established and may never be.

[2] Refers to PAGEID #.

beginning, Chulsky alleges that Parry pressured her, reminding Chulsky that she was "indebted to him," and asking for a photo of her as repayment. (*Id.* at #4–5). Relenting, Chulsky sent certain "innocent" photos of herself. (*Id.* at #5). She alleges, though, that this only caused Parry to demand more explicit photos, threatening that, if she did not comply, he would disclose their relationship to Chulsky's husband. (*Id.*).

Chulsky says that at this same time, Parry was using "his position and authority over" her as leverage to prevent Chulsky from reporting his conduct to Golden Corral. (*Id.*). Parry allegedly told Chulsky that he had previously used his influence in the company to prevent another woman from reporting sexual harassment by a male employee, and threatened to "destroy" Chulsky if she raised the issue with Golden Corral. (*Id.*). Fearing for her job, Chulsky remained silent, for a time. (*Id.*).

Parry's conduct continued to escalate, however. Chulsky reached a breaking point when Parry allegedly forwarded to Chulsky's husband some of the photographs Chulsky had sent to Parry. (*Id.*). With at least one of the forwarded photos, Parry also included a text to Chulsky's husband, which thanked Chulsky's husband for "sharing" Chulsky with Parry. (*Id.* at #5–6). She reported Parry to Golden Corral's human resources department, but according to her, the restaurant failed to "meaningfully or reasonably discipline" Parry or otherwise take corrective action. (*Id.* at #6). Chulsky alleges that Parry's conduct, combined with Golden Corral's inaction, caused her to suffer extreme emotional distress, including humiliation, depression, anxiety, and anger. (*Id.*).

3

Chulsky filed this lawsuit on October 16, 2019, asserting statutory employment discrimination claims under both federal and state law against Parry, Golden Corral Corporation, CPB Foods, LLC, and Manna, Inc. (*Id.* at #3, 6–8). (She has since withdrawn her federal law employment discrimination claims against Parry, for reasons noted below, but not the other defendants.)

Shortly after she filed her suit, she sent a copy of the Complaint, Summons, and a Waiver of Service request to Parry's last known address. (Treadaway Decl., Doc. 21-1, #134). Three months later, as Parry had neither appeared nor executed the waiver, Chulsky hired a process server to find Parry and attempt service in Texas. (*Id.*). The process server reported that Parry had sold his Texas home in November 2019, and that a search for his updated address had proved fruitless. (*Id.*).

Chulsky requested Parry's new address from Golden Corral in April 2019. (*Id.* at #134–35). Although Golden Corral provided one two weeks later, that address correlated to a business park in St. George, Utah. (*Id.* at #135). Finally, Chulsky purchased a paid search service from Westlaw, which uncovered a previously unknown residential address also in St. George. (*Id.*). Chulsky then hired another process server, who successfully served Parry at this address on August 21, 2020, approximately ten months after Chulsky filed the Complaint. (*Id.*).

Parry moved to dismiss on September 1, 2020, relying on Fed. R. Civ. P. 12(b)(2) (lack of personal jurisdiction),[3] 12(b)(6) (failure to state a claim), and 12(b)(5) and 4(m) (insufficient service of process). (*See generally* Mot., Doc. 18). Chulsky filed

---

[3] Although Parry cites Fed. R. Civ. P. 12(b)(6) as the basis for his jurisdictional argument, (*see* Mot., Doc. 18, #74), any such argument necessarily arises under Fed. R. Civ. P. 12(b)(2).

her opposition on October 16, 2020 (Pl. Mem. in Opp'n to Def. Mot. to Dismiss ("Resp."), Doc. 21), and Parry replied on October 29, 2020 (Def. Reply in Supp. of Mot to Dismiss ("Reply"), Doc. 22). The matter is now ripe.

## LEGAL STANDARD

Because the Motion presses three arguments—lack of personal jurisdiction, insufficiency of service, and failure to state a claim—three different legal standards are involved.

First, faced with a motion to dismiss for lack of personal jurisdiction under Fed. R. Civ. P. 12(b)(2), a court has three options: it (1) "may determine the motion on the basis of affidavits alone"; (2) "permit discovery in aid of the motion"; or (3) "conduct an evidentiary hearing on the merits of the motion." *Malone v. Stanley Black & Decker, Inc.*, 965 F.3d 499, 505 (6th Cir. 2020) (quoting *Serras v. First Tenn. Bank Nat. Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989)). If the court decides the motion on the pleadings and affidavits alone, a plaintiff need only make a prima facie showing of personal jurisdiction. *Id.* (quoting *Schneider v. Hardesty*, 669 F.3d 693, 697 (6th Cir. 2012)). In evaluating whether the plaintiff has met this "relatively slight" burden, the court "must consider the pleadings and affidavits in the light most favorable to the plaintiff." *Am. Greetings Corp. v. Cohn*, 839 F.2d 1164, 1169 (6th Cir. 1988) (quoting *Welsh v. Gibbs*, 631 F.2d 436, 439 (6th Cir. 1980)). And the court "does not weigh the controverting assertions of the party seeking dismissal," so as to "prevent non-resident defendants from regularly avoiding personal jurisdiction

simply by filing an affidavit denying all jurisdictional facts." *Theunissen v. Matthews*, 935 F.2d 1454, 1459 (6th Cir. 1991) (citing *Serras*, 875 F.2d at 1214).

Here, the Court is deciding the motion without conducting an evidentiary hearing or permitting jurisdictional discovery—the parties requested neither—and therefore considers the pleadings and affidavits in a light most favorable to Chulsky. Thus, consistent with the authority above, insofar as the parties aver conflicting accounts of the salient facts, the Court resolves those conflicts in Chulsky's favor. With that version of the facts in mind, "[d]ismissal in this procedural posture is proper only if all the specific facts which the plaintiff ... alleges collectively fail to state a prima facie case for jurisdiction." *Kerry Steel, Inc. v. Paragon Indus.*, 106 F.3d 147, 149 (6th Cir. 1997) (quoting *Theunissen*, 935 F.2d at 1458).

Second, in resolving a motion to dismiss for insufficient service under Fed. R. Civ. P. 12(b)(5), the burden is on the party asserting the validity of service to demonstrate that service on the moving party "satisfied the requirements of the relevant portions of Rule 4 and any other applicable provision of law." *Light v. Wolf*, 816 F.2d 746, 751 (D.C. Cir. 1987) (internal quotations omitted); *accord Robinson v. Tenn. Highway Patrol*, No. 116CV01296, 2017 WL 3234390, at *2 (W.D. Tenn. July 31, 2017). As with a motion under Rule 12(b)(2), a court may look outside the pleadings to determine whether this showing has been made. *See Robinson*, 2017 WL 3234390, at *2. A court has "broad discretion" to dismiss an action for insufficient service. *Sherer v. Construcciones Aeronauticas, S.A.*, 987 F.2d 1246, 1247 (6th Cir. 1993).

6

Finally, Parry asserts that Chulsky's Complaint should be dismissed under Fed. R. Civ. P. 12(b)(6) for failure to state a claim. A plaintiff must "state[] a claim for relief that is plausible, when measured against the elements" of a claim. *Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Binno v. Am. Bar Ass'n*, 826 F.3d 338, 345–46 (6th Cir. 2016)). "To survive a motion to dismiss, in other words, [the plaintiff] must make sufficient factual allegations that, taken as true, raise the likelihood of a legal claim that is more than possible, but indeed plausible." *Id.* (citations omitted).

In making that assessment, the court must similarly "construe the complaint in the light most favorable to the plaintiff, accept its allegations as true, and draw all reasonable inferences in favor of the plaintiff." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008) (internal quotation omitted). That is true, however, only as to factual allegations. The court need not accept as true Plaintiff's legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Moreover, the well-pled facts must be sufficient to "raise a right to relief above the speculative level," such that the asserted claim is "plausible on its face." *Iqbal*, 556 U.S. at 678; *Twombly*, 550 U.S. at 546–47. Under the *Twombly/Iqbal* plausibility standard, courts play an important gatekeeper role, ensuring that claims meet a plausibility threshold before defendants are subjected to the potential rigors (and costs) of the discovery process. "Discovery, after all, is not designed as a method by which a plaintiff discovers whether he has a claim,

but rather a process for discovering evidence to substantiate plausibly-stated claims." *Green v. Mason*, 504 F. Supp. 3d 813, 827 (S.D. Ohio 2020).

## LAW AND ANALYSIS

Parry argues that Chulsky's Complaint against him must be dismissed for three independent reasons: this Court lacks personal jurisdiction, the Complaint fails to state a claim, and Chulsky did not properly serve Parry. The Court will address the jurisdiction-related issues (personal jurisdiction and sufficiency of service) before turning to the merits of Chulsky's Complaint. That is because, as a general matter, a court should determine whether it has jurisdiction before considering the merits of the asserted claims. If a court lacks personal jurisdiction over a party, for example, a court is "powerless to take further action" against that party. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1214 n.6 (11th Cir. 1999) (per curiam) (citing *Read v. Ulmer*, 308 F.2d 915, 917 (5th Cir. 1962)); *see also Alcoa, Inc. v. Delta (Springbok)*, No. 3:07-CV-274, 2008 WL 11449394, at *6 (S.D. Ohio Oct. 9, 2008), adhered to on reconsideration, No. 3:07-CV-274, 2009 WL 983048 (S.D. Ohio Apr. 13, 2009). Similarly, if service is defective, then Parry is not properly before this Court, an issue that naturally precedes the question of whether Chulsky has plausibly stated a claim. *See Wyrough & Loser, Inc. v. Pelmor Labs., Inc.*, 376 F.2d 543, 547 (3d Cir. 1967) ("[P]reliminary matters such as defective service, personal jurisdiction and venue should be raised

and disposed of before the court considers the merits or quasimerits of a controversy.").

## A.   The Court Has Specific Personal Jurisdiction Over Parry.

Personal jurisdiction comes in two flavors: general and specific. A court located in a given state may exercise "general jurisdiction" over a non-resident defendant whose contacts with the forum state are so "'continuous and systematic' as to render [the defendant] essentially at home" there. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)). "Specific jurisdiction," on the other hand, applies when a defendant's contacts with the forum state are fewer or less intimate, but where the legal action "arise[s] out of or relate[s] to" those contacts. *Ford Motor Co. v. Montana Eighth Jud. Dist. Ct.*, 141 S. Ct. 1017, 1025 (2021) (quoting *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 137 S. Ct. 1773, 1780 (2017)). Here, Chulsky does not argue for general jurisdiction and, in any case, the record would not support such an exercise of jurisdiction. (Typically, as to individuals, general jurisdiction exists only in the state in which the party resides.[4]) Accordingly, the Court focuses

---

[4] Although the "paradigm forum for the exercise of general jurisdiction" over an individual defendant is the defendant's domicile, *Goodyear*, 564 U.S. at 924, a court may nonetheless exercise general jurisdiction over a non-resident individual where the defendant's contacts with the forum are continuous and systematic. *See Holt Oil & Gas Corp. v. Harvey*, 801 F.2d 773, 779 (5th Cir. 1986) (holding "constant and extensive personal and business connections with Texas throughout [the defendant's] adult life" supported exercise of general personal jurisdiction over Oklahoma resident). The precise contours of general jurisdiction over individuals matters little here, however, because, as explained further below, this case does not turn on an exercise of general jurisdiction.

its analysis on whether it may properly exercise specific personal jurisdiction over Parry.

The Court has subject matter jurisdiction over this action based on federal question jurisdiction as to the Title VII claims, *see* 28 U.S.C. § 1331, combined with supplemental jurisdiction over the attendant state law claims, *see* 28 U.S.C. § 1367, the latter being the only remaining claims against Parry.[5] Where, as here, the Court's subject-matter jurisdiction is based on a federal question, the exercise of personal jurisdiction over a defendant is proper if it is "both authorized by the forum State's long-arm statute and in accordance with the Due Process Clause of the Fourteenth Amendment." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 549 (6th Cir. 2016) (citing *Bird v. Parsons*, 289 F.3d 865, 871 (6th Cir. 2002), in turn quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 954 F.2d 1174, 1176 (6th Cir. 1992)). Accordingly, the Court starts its analysis with Ohio's long-arm statute, Ohio Rev. Code § 2307.382, and then turns to the Due Process Clause.

### 1.    The Court May Properly Exercise Personal Jurisdiction Over Parry Pursuant To Ohio's Long-Arm Statute.

At the time Chulsky sued, Ohio's long-arm statute consisted of a list of enumerated acts set forth in § 2307.382(A), followed by an admonition in § 2307.382(C) that "[w]hen jurisdiction over a person is based solely upon this section, only a cause of action arising from acts enumerated in this section may be asserted

---

[5] Chulsky withdrew her Title VII claims against Parry in the course of briefing the instant motion. (*See* Resp., Doc. 21, #128 n.2). Those federal claims remain against the corporate defendants.

against him." Ohio Rev. Code Ann. § 2307.382 (West 2019).[6] Not surprisingly, given the statute's plain language, courts routinely noted that Ohio's long-arm statute did not extend jurisdiction to the fullest extent that the Due Process Clause allows. *See, e.g.*, *Schneider*, 669 F.3d at 699 (quoting *Estate of Thomson ex rel. Estate of Rakestraw v. Toyota Motor Corp. Worldwide*, 545 F.3d 357, 361 (6th Cir. 2008)); *Hoover Co. v. Robeson Indus. Corp.*, 904 F. Supp. 671, 673 (N.D. Ohio 1995) ("It has since become clear that Ohio state courts do not interpret Ohio Rev. Code § 2307.382(A) to extend personal jurisdiction to the limits of due process." (citing *Goldstein v. Christiansen*, 638 N.E.2d 541, 546 (Ohio 1994))).

Indeed, Ohio's Supreme Court expressly noted that the long-arm statute reflected a "two-part analysis," which obligated a court to "(1) determine whether the state's 'long-arm' statute and the applicable Civil Rule confer[ed] personal

---

[6] The Ohio General Assembly recently amended Ohio's long-arm statute, effective April 7, 2021. Ohio Rev. Code 2307.382(C) ("In addition to a court's exercise of personal jurisdiction under subsection (A) of this section, a court may exercise personal jurisdiction over a person on any basis consistent with the Ohio Constitution and the United States Constitution."); *see also* Am. H.B. 272, 133d Gen. Assemb. (Ohio 2020); Am. Sub. S.B. 10, 133d Gen. Assemb. (Ohio 2020). This amendment has raised the question whether a court must separately analyze the jurisdictional exercise under both the long-arm statute *and* the Due Process Clause, or whether these inquiries have merged. *Compare C.T. v. Red Roof Inns, Inc.*, No. 2:19-CV-5384, 2021 WL 2942483, at *10 (S.D. Ohio July 1, 2021) ("Thus, even if the TVPRA does not confer nationwide service of process, this Court could still exercise jurisdiction over a suit if it comported with Ohio's long-arm statute and the U.S. Constitution, which are now coextensive."), *with Premier Prop. Sales Ltd. v. Gospel Ministries Int'l, Inc.*, 539 F. Supp. 3d 822, 828 n.2 (S.D. Ohio 2021). ("This interpretation does not, however, collapse the long-arm statute's specific jurisdiction test into the Federal standard. Plaintiffs … asserting that a court has specific jurisdiction over a defendant must still demonstrate their claim arose from one of the enumerated factors."). However, because Chulsky filed this action on October 16, 2019, (Compl., Doc. 1), the Court need not consider the effect of this amendment on the exercise of jurisdiction here. *See Smith v. Swaffer*, No. 1:20-CV-1848, 2021 WL 4596922, at *10 (N.D. Ohio Oct. 7, 2021) ("Jurisdiction is determined as of the commencement of the action." (citing *Mollan v. Torrance*, 22 U.S. (9 Wheat.) 537, 539–40 (1824))).

jurisdiction, and if so, (2) whether granting jurisdiction under the statute and rule would deprive the defendant of the right to due process of law pursuant to the Fourteenth Amendment to the United States Constitution." *Goldstein*, 638 N.E.2d at 543 (citing *U.S. Sprint Comm'ns Co., Ltd. P'ship v. Mr. K's Foods, Inc.*, 624 N.E.2d 1048, 1051 (Ohio 1994)). According to that court, merging these inquiries (i.e., treating the long-arm statute as coterminous with the Due Process Clause) would render the first inquiry "nugatory." *Id.* at 545 n.1.

The Court starts its jurisdictional analysis, then, by assessing whether Parry's contacts with Ohio bring him within the bounds of one of the enumerated categories in Ohio Rev. Code § 2307.382. On that question, both parties frame the long-arm analysis with reference to Ohio Rev. Code §§ 2307.382(A)(1) and (A)(6). (*See* Mot., Doc. 18, #77; Resp., Doc. 21, #121). Those subsections confer personal jurisdiction over:

> a person who acts directly or by an agent, as to a cause of action arising from the person's:
>
> > (1) Transacting any business in [Ohio]; … [or]
> > …
> > (6) Causing tortious injury in [Ohio] to any person by an act outside [Ohio] committed with the purpose of injuring persons, when the person might reasonably have expected that some person would be injured thereby in [Ohio].

Ohio Rev. Code §§ 2307.382(A)(1), (A)(6).

Begin with subsection (A)(1), "[t]ransacting any business." The Ohio Supreme Court has interpreted subsection (A)(1) broadly; according to that court, the phrase "transacting any business" encompasses more than just a "contract." *Ky. Oaks Mall Co. v. Mitchell's Formal Wear, Inc.*, 559 N.E.2d 477, 480 (Ohio 1990) (quoting Black's

Law Dictionary 1341 (5th ed. 1979)). As Ohio appellate courts have consistently reiterated, "[t]o 'transact' under [Ohio Rev. Code §] 2307.382(A)(1) means 'to prosecute negotiations; to carry on business; to have dealings.'" *ATA Logistics, Inc. v. Empire Container Freight Station, Inc.*, No. CA2020-01-006, 2020 WL 4932794, at *3 (Ohio Ct. App. Aug. 24, 2020) (quoting *Dahlhausen v. Aldred*, 932 N.E.2d 949, 954 (Ohio Ct. App. 2010)).

One factor relevant to "transacting business" is whether the out-of-state defendant "reached out to the plaintiff in the forum state to create a business relationship." *Paglioni & Assocs., Inc. v. WinnerComm, Inc.*, No. 2:06-CV-00276, 2007 WL 852055, at *9 (S.D. Ohio Mar. 16, 2007) (citing *Ricker v. Fraza*, 828 N.E.2d 205, 210 (Ohio Ct. App. 2005)). A second factor to consider is whether "the parties conducted their negotiations or discussions in the forum state or with terms affecting the forum state." *Id.* (citing *Ricker*, 828 N.E.2d at 210). But even if both these factors weigh in favor of the plaintiff, the "plaintiff still must demonstrate that there is a substantial connection between the defendant and the forum state." *Id.* (citing *U.S. Sprint Commc'ns Co.*, 624 N.E.2d at 1052).

The unique facts of this case make application of the "transacting business" standard difficult. On one hand, Chulsky alleges that Parry traveled several times to Ohio and that he was conducting business on behalf of Golden Corral when the two first met. And, at least at the outset, Parry's communications were business-oriented, in that they involved personnel matters and promotional opportunities within Golden Corral. Chulsky further alleges that Parry's conduct affected the terms and

conditions of her employment. These considerations suggest that Parry was transacting business in Ohio relating to the nature of Chulsky's claims in this lawsuit.

On the other hand, Parry did not "reach out" to Ohio to create a "business relationship" with Chulsky. Rather, the gist of the Complaint is that Parry sought to cultivate a significantly more personal relationship with Chulsky. And the contacts Chulsky alleges—personal notes, photos, and threatening texts—do not seem to contemplate the negotiation or consummation of a classic business transaction. That is, Parry's contacts with Ohio—save his few in-person visits, made at the behest of Golden Corral—do not comfortably fit within the ordinary understanding of the term "business," nor "within the statutory language or the Ohio Supreme Court's definition of 'transacting.'" *See Thomas v. Dykstra*, 309 F. Supp. 3d 480, 485 (N.D. Ohio 2018).[7]

At bottom, the facts here present a nettlesome question on the (A)(1) front. The Court concludes that it need not decide that question, however. That is because, even if Parry's Ohio contacts do not constitute "transacting business" for purposes of subsection (A)(1), the Court concludes that subsection (A)(6) provides a proper basis for personal jurisdiction over Parry. That is the issue to which the Court turns now.

Under (A)(6), the relevant inquiry is whether Parry caused tortious injury to a person in Ohio by an act committed outside Ohio and with the purpose of injuring a person or persons, when Parry might reasonably have expected that some person

---

[7] Moreover, even assuming that Parry's visits to Ohio, inspection of certain facilities, and initial meeting with Chulsky constitute "transacting business," it is not clear that Chulsky's causes of action "arise[] from" these contacts. *See* Ohio Rev. Code § 2307.382(A).

would be consequently injured in Ohio. Ohio Rev. Code § 2307.382(A)(6); *Grigor v. Starmark Hospitality Grp. LLC*, No. 2:10-CV-20, 2010 WL 2403137, at *5 (S.D. Ohio June 10, 2010). As with subsection (A)(1), courts have broadly construed this provision of Ohio's long-arm statute. *Grigor*, 2010 WL 2403137, at *5 (quoting *Shaker Const. Grp., LLC v. Schilling*, No. 1:08CV278, 2008 WL 4346777, at *4 (S.D. Ohio Sept. 18, 2008)).

Here, Chulsky alleges that Parry regularly contacted her from outside Ohio over the course of at least nine months (October 2016 to July 2017). (*See* Compl., Doc. 1, #4, 5). These communications initially concerned work-related matters, but later evolved into requests for explicit photographs, perceived threats against Chulsky's employment and marital relationship, and at least one anecdote allegedly designed to illustrate Parry's ability to evade the consequences of his actions. According to Chulsky, this conduct affected the terms and conditions of her employment with Golden Corral and caused her extreme emotional pain and suffering. Construed in Chulsky's favor, these allegations—particularly those alleging Parry's attempts to keep Chulsky silent—permit a strong inference that Parry appreciated the wrongful nature of his conduct. Moreover, a reasonable person in Parry's shoes could have expected that such untoward communications would cause injury to the recipient in Ohio. *See* Ohio Rev. Code § 2307.382(A)(6). Indeed, Parry's alleged insistence that Chulsky not report his conduct to Golden Corral indicates (assuming, as the Court must, that the allegation is true) that he also *subjectively* recognized that his

communications were wrongful and injurious. That certainly seems to meet the requirements of (A)(6).

Moreover, as Ohio's long-arm statute separately requires, Chulsky's claims here "arise[] from," *see* Ohio Rev. Code § 2307.382(A), these very contacts. The Sixth Circuit has interpreted this phrase in Ohio's long-arm statute to require a proximate cause relationship between the defendant's forum-state contacts and the plaintiff's cause of action. *Brunner v. Hampson*, 441 F.3d 457, 465–66 (6th Cir. 2006). Parry's conduct, as alleged, meets this standard. His communications to Chulsky in Ohio form the primary basis of her state employment discrimination claims in this case, and, on this point, Parry makes no specific argument to the contrary. Thus, jurisdiction under (A)(6) is appropriate.

To be sure, Parry urges a different result. His primary argument is that courts have limited (A)(6) to cases where communications to Ohio residents have, in and of themselves, constituted intentional torts. (Mot., Doc. 18, #78 (citing *Schneider*, 669 F.3d at 700)). Here, Parry says, Chulsky alleges only employment discrimination, which "arguably is not a tort at all, much less an intentional tort." (*Id.*).

Parry's argument reads subsection (A)(6) too narrowly. While Parry is correct that courts have held that allegedly fraudulent communications suffice as a basis for jurisdiction under (A)(6), he has offered no authority for the proposition that *only* communications that themselves constitute fraud or other common law, intentional torts will qualify. To the contrary, an Ohio federal district court recently held that a plaintiff could rely on subsection (A)(6) to establish personal jurisdiction in a matter

16

involving allegations of employment discrimination under Ohio Rev. Code § 4112—
i.e., the same type of claim at issue here. *Dugger v. Honeywell Int'l, Inc.*, No. 1:21-CV-
00892, 2021 WL 5961624, at *6 (N.D. Ohio Dec. 16, 2021) ("Section (A)(6)'s
requirements are met because Ms. Dugger[] has alleged Mr. Hached intentionally
and willfully discriminated against Ms. Dugger …."). Nor, relatedly, is Parry correct
that employment discrimination is not a tort for jurisdiction purposes. *See id.* at *5
(citing *Glass v. Tradesmen Int'l, LLC*, 505 F. Supp. 3d 747, 768 (N.D. Ohio 2020)); *see
also Reilly v. Alcan Aluminum Corp.*, No. 98-3566, 1999 WL 313879 at *2–4 (6th Cir.
May 5, 1999) (analyzing Ohio employment discrimination claims as tort claims for
choice-of-law purposes). To the contrary, as Chulsky notes, a violation of Ohio Rev.
Code § 4112.02 satisfies the definition of tort for such purposes, as it is a "civil wrong,
other than breach of contract, for which the court will provide a remedy." (Resp., Doc.
21, #123 (quoting W. Page Keeton, et al., Prosser and Keeton on The Law of Torts 1,
2 (5th ed. 1984))).

With subsection (A)(6)'s contours correctly defined, the jurisdictional analysis,
as described above, is straightforward. Thus, the Court concludes that Ohio's long-
arm statute, as it existed at the time suit was filed, provides a basis for personal
jurisdiction over Parry.

### 2.   The Court May Exercise Personal Jurisdiction Over Parry Consistent With The Due Process Clause.

It is not enough that Parry's Ohio contacts bring him within the contours of
Ohio's long-arm statute. Chulsky also must show that the Court's exercise of
jurisdiction over Parry would comport with the Due Process Clause. On that front,

though perhaps a closer call, the Court again concludes that Chulsky has made the necessary showing.

"When determining whether a district court's exercise of personal jurisdiction would offend due process, '[t]he relevant inquiry is whether … the non-resident defendant possesses such minimum contacts with the forum state that the exercise of jurisdiction would comport with traditional notions of fair play and substantial justice.'" *Beydoun v. Wataniya Rests. Holding, Q.S.C.*, 768 F.3d 499, 505 (6th Cir. 2014) (quoting *Theunissen*, 935 F.2d at 1459). As the Supreme Court recently reiterated, "a strong 'relationship among the defendant, the forum, and the litigation'" is the "'essential foundation' of specific jurisdiction." *Ford Motor Co.*, 141 S. Ct. at 1028 (quoting *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414 (1984)). The Sixth Circuit outlined a three-pronged test to guide the due process inquiry in *Southern Machine Co. v. Mohasco Industries, Inc.*:

> First, the defendant must purposefully avail himself of the privilege of acting in the forum state or causing a consequence in the forum state. Second, the cause of action must arise from the defendant's activities there. Finally, the acts of the defendant or consequences caused by the defendant must have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable.

401 F.2d 374, 381 (6th Cir. 1968). The Court addresses each of these three prongs in succession.

### a. Parry Has Purposefully Availed Himself Of Ohio.

The first prong of the test is the "*sine qua non* for *in personam* jurisdiction." *Id.* at 381–82. It asks whether the defendant has "purposefully avail[ed] [himself] of the privilege of conducting activities within the forum State, thus invoking the benefits

and protections of its laws." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quoting *Hanson v. Denckla*, 357 U.S. 235, 253 (1958)). This requirement "ensures that a defendant will not be haled into a jurisdiction solely as a result of 'random,' 'fortuitous,' or 'attenuated' contacts, or of the 'unilateral activity of another party or a third person.'" *Id.* (internal citations omitted). Importantly, "physical presence in a forum state is not required, and the Supreme Court has 'consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction there.'" *Air Prod. & Controls, Inc. v. Safetech Int'l, Inc.*, 503 F.3d 544, 551 (6th Cir. 2007) (quoting *Burger King*, 471 U.S. at 476).

The Sixth Circuit has suggested that, where the plaintiff alleges tortious activity directed toward a forum resident, the minimum contacts inquiry is guided by the Supreme Court's decision in *Calder v. Jones*, 465 U.S. 783 (1984). *See Reynolds v. Int'l Amateur Athletic Fed'n*, 23 F.3d 1110, 1119 (6th Cir. 1994) (analogizing to *Calder* where the district court predicated personal jurisdiction on subsection (A)(6) of Ohio's long-arm statute). *Calder* sets forth the so-called "effects test" for minimum contacts, based on the proposition that a defendant's conduct outside the forum state may suffice to confer personal jurisdiction if the defendant "purposefully directs activities towards the forum state with the intent to cause harm there." *Scotts Co. v. Aventis S.A.*, 145 F. App'x 109, 113 (6th Cir. 2005); *Calder*, 465 U.S. at 790.

Although without making explicit reference to the "effects test," the Sixth Circuit appears to have applied that test to analyze the defendant's contacts in *Neal*

19

*v. Janssen*, 270 F.3d 328 (6th Cir. 2001).[8] *See Mammoth Res. Partners, Inc. v. Phoenix Drilling, Inc.*, No. 1:10-CV-36-M, 2010 WL 2651079, at *4 (W.D. Ky. June 30, 2010) ("In *Neal v. Janssen* … the Sixth Circuit applied the 'effects test' in the context of a fraud claim."). There, the Sixth Circuit found that the defendant had purposefully availed himself of the privilege of acting in Tennessee by sending false information into Tennessee via phone calls and facsimiles. *Neal*, 270 F.3d at 332. Although the defendant had never visited Tennessee, *id.* at 333, the court noted that the "acts of making phone calls and sending facsimiles into the forum, standing alone, may be sufficient to confer jurisdiction on the foreign defendant where the phone calls and faxes form the bases for the action." *Id.* at 332 (citing *Oriental Trading Co. v. Firetti*, 236 F.3d 938, 943 (8th Cir. 2001)). The communications at issue there sufficed to confer jurisdiction because they had "foreseeable effects in Tennessee," "were directed at individuals in Tennessee," and were not merely incidental to the action, but formed "the heart of the lawsuit." *Id.*

The same is true of Parry's communications here. Parry and Chulsky "corresponded regularly," with Parry sending "personal notes, gifts, and photographs of himself" to Chulsky in Ohio. (Compl., Doc. 1, #4). Parry allegedly requested explicit photographs of Chulsky, threatened to divulge their relationship should she fail to comply, and even sent certain explicit photos to Chulsky's husband (ostensibly

---

[8] The Sixth Circuit seems to apply the "effects test" as a manner of determining only the first prong of the *Southern Machine* test, purposeful availment. *See Scotts Co.*, 145 F. App'x at 114–15 (finding purposeful availment based on application of *Calder*'s principles, then continuing to analyze the "arising from" and "reasonableness" prongs of *Southern Machine*). Thus, the Court follows the same framework.

another Ohio-directed contact). This intentional course of conduct, directed at Chulsky in Ohio, allegedly created a hostile work environment for Chulsky and constituted quid pro quo sexual harassment, in violation of state discrimination law. As such, the Court is satisfied that Parry has "purposefully direct[ed] communications into [Ohio] that cause[d] injury within the forum, and those communications form the 'heart' of the cause of action." *See Neal*, 270 F.3d at 332; *see also Vandenberg & Sons Furniture, Inc. v. Katchen*, No. 1:12-CV-1021, 2013 WL 504168, at *4 (W.D. Mich. Feb. 12, 2013) (finding purposeful availment where defendant allegedly "sent at least one fax into Michigan," because "one fax is sufficient to trigger a federal cause of action under the [Telephone Consumer Protection Act]"); *Vlach v. Yaple*, 670 F. Supp. 2d 644, 649 (N.D. Ohio 2009) (finding purposeful availment where defendant sent three communications to plaintiff in Ohio, allegedly in violation of the Fair Debt Collection Practices Act and Ohio Consumer Sales Practices Act).

Parry asserts two arguments to the contrary. First, Parry argues that he did not purposefully avail himself of Ohio because, according to him, "contacts in a commercial context are treated differently than those in a non-commercial context." (Mot., Doc. 18, #79 (quoting *Radford v. Stollznow*, No. 14-cv-0334, 2014 WL 12789007, at *6 (D.N.M. Aug. 5, 2014))). That is, he says contacts of a personal nature generally do not evince purposeful availment, and he seeks to characterize the contacts alleged in this case as entirely "personal [and] non-commercial." (*Id.* at #82).

As an initial matter, the Court resists Parry's characterization. Chulsky alleges Parry traveled to Ohio several times on business, where he engaged in training and inspection at Golden Corral facilities. She says that the two met during these visits and spoke on "each instance." (Compl., Doc. 1, #4). She alleges that the two formed a business-oriented relationship wherein Parry, through his communications to Ohio, "mentor[ed]" her and informed her of personnel matters at Golden Corral, where they both worked and where Parry held some form of supervisory role.[9] (*See id.* at #4–5). She further alleges that these contacts interfered with the terms and conditions of her Ohio-based employment. Thus, the Court declines to accept Parry's description of the relationship as entirely "personal," as it appears that, at the very least, this is a contested question of fact. (*See* Resp., Doc. 21, #121 ("Parry … abused his position of authority over [Chulsky] as an agent of the company doing business in Ohio. His characterization that this was a romantic relationship is a self-serving issue of fact.")).[10]

---

[9] Courts, both in the Sixth Circuit and elsewhere, have held that communications directed into a forum state in the course of a supervisor-employee relationship may constitute purposeful availment. *See Dugger*, 2021 WL 5961624, at *9; *Morton v. Advance PCS, Inc.*, No. 3:04-CV-278, 2006 WL 2222683, at *2 (E.D. Tenn. Aug. 2, 2006) (human resources officer of company doing business in forum state purposefully availed herself of forum by supervising in-state defendant, jointly deciding to terminate plaintiff, and training forum-based employees via weekly phone calls); *Wallens v. Milliman Fin. Risk Mgmt. LLC*, 509 F. Supp. 3d 1204, 1216 (C.D. Cal. 2020) (purposeful availment satisfied by "virtual contacts [] directed toward California [] for the purpose of [plaintiff] performing work for the benefit of Defendants and under [defendant's] direct supervision"). Although Chulsky's allegations of Parry's direct supervisory conduct do not rise to the level of those in the cited cases (and thus the Court declines to decide the question on those grounds), the parties' shared employer and the nature of the claims nonetheless give the Court pause.

[10] Even accepting Parry's premise that the contacts here are "personal" or "non-commercial" (whatever the talismanic significance of that term), this does not convince the Court that such a characterization requires a different outcome. The cases Parry cites for this

Second, and somewhat relatedly, Parry argues that exercising jurisdiction here would impermissibly focus the jurisdictional inquiry on his contacts with the *plaintiff*, rather than his contacts "with the forum State itself." (Mot., Doc. 18, #80). To be sure, the Supreme Court in *Walden v. Fiore*—another "effects test" case—made clear that the plaintiff "cannot be the only link between the defendant and the forum." 571 U.S. 277, 285 (2014) (citing *Burger King*, 471 U.S. at 478). But a review of the facts in *Walden* shows that this case provides little help to Parry here. In *Walden*, two Nevada residents sued a Georgia law enforcement officer because he allegedly violated their rights by seizing a large amount of money they had attempted to carry through the Atlanta airport. In holding that a Nevada court had no personal jurisdiction over the Georgia officer for acts committed in Georgia, the Supreme Court found that the officer did not have "anything to do with Nevada." *Id.* at 289. He "never traveled to, conducted activities within, contacted anyone in, or sent anything or anyone to Nevada"; indeed, his only connection to Nevada was that he knew the plaintiffs were from there, and that they might feel a financial loss there resulting from his seizure of their money. *Id.* at 289–90. Thus, despite his allegedly tortious conduct directed

---

personal/commercial dichotomy draw the distinction from *Kulko v. Superior Court of California*, 436 U.S. 84 (1978). But *Kulko* recognized that non-commercial contacts might nonetheless make reasonable the exercise of jurisdiction where those contacts effect tortious harm within the state. *See id.* at 96–97. Indeed, in declining to apply the "effects" test, the Supreme Court specifically noted that there was "no claim that [the non-resident defendant] ha[d] visited physical injury on either property or persons within the State of California," and, moreover, observed that the cause of action arose "from a separation that occurred in the State of New York [and] … a contract that was negotiated in New York and that she flew to New York to sign." *Id.* at 97. Here, in contrast, Chulsky alleges what was missing in *Kulko*: injury within the state arising proximately from Parry's communications.

toward the Nevada-resident plaintiffs (when they were present in Georgia), personal jurisdiction in the Nevada courts was improper.

Parry's forum-state contacts here are more numerous and more substantial than the defendant's in *Walden*. Parry, by his own admission, traveled to Eastgate at least four times on business with Golden Corral (Parry Aff., Doc. 18-1, #91), an organization in which he occupied some sort of supervisory, corporate role. According to Chulsky, he spent time speaking with her on each such occasion. And, at least as importantly for present purposes, though Parry claims he did not return to Eastgate at any point after the "relationship" with Chulsky developed, he continually directed communication toward Chulsky, knowing her to be in Ohio, which allegedly included harassing requests for explicit photos, unwanted photographs of himself, and threats to Chulsky's employment and marriage. Thus, in stark contrast to the defendant in *Walden*, Parry *has* "traveled to, conducted activities within, contacted [some]one in, [and] sent [some]thing" to Ohio, *see Walden*, 571 U.S. at 289, which allegedly resulted in direct harm occurring within the State.

Parry's affidavit does nothing to contradict these allegations. Parry avers that Chulsky called him 292 times during the relevant period, (Parry Aff., Doc. 18-1, #92), perhaps to suggest that Chulsky initiated certain of the contacts here. Fair enough—purposeful availment cannot be predicated on unilateral acts of the plaintiff. *Schneider*, 669 F.3d at 701 (quoting *Citizens Bank v. Parnes*, 376 F. App'x 496, 502 (6th Cir. 2010)). However, Parry goes on to aver that he called Chulsky 105 times,

24

and states that this number does not include "video chat and other electronic communications" between the two. (Parry Aff., Doc. 18-1, #92).

Moreover, his affidavit confirms that Chulsky was in Ohio when at least some of the communications transpired. (*See id.* (calls took place "during [Chulsky's] morning commute" and while she was at home)). While the complained-of communications could be said to largely hinge on Chulsky, and relate to Ohio principally because of her residence there, this is more than the mere "foreseeable harm" in the forum state that the Supreme Court found insufficient in *Walden*. As described in the Court's discussion of *Neal*, Parry directed his communications into Ohio, and those communications themselves allegedly violate state law, at least insofar as they affect the terms and conditions of Chulsky's Ohio-based employment.

Parry insists that this case is just like *Radford v. Stollznow*, No. 14-cv-0334, 2014 WL 12789007 (D.N.M. Aug. 5, 2014), but the Court disagrees. To be sure, in *Radford*, the court found specific personal jurisdiction lacking, and it did so despite a significant number of contacts between the plaintiff and defendant in both "professional" and "personal" capacities. Indeed, much like here, the defendant sent emails, telephone calls, letters, cards, and gifts to the plaintiff while the plaintiff was in New Mexico, and the plaintiff alleged that the defendant physically visited the state once, where the parties appeared on a radio program together. *Id.* at *1. And, as also happened here, the relationship later soured. The defendant then allegedly told the plaintiff's New York-based employer that the plaintiff had sexually harassed her, and later wrote an internet blog post about an "unnamed" man whose

"psychological abuse [of Defendant] turned physical [when] he sexually assaulted [Defendant] on several occasions." *Id.* at *1–2. Plaintiff alleged that readers of the post believed him to be the unnamed man and began to send him abusive communications. *Id.* at *2. Plaintiff also claimed that the defendant fed defamatory information about him to other bloggers, intending for them to post it on the internet. *Id.* Based on these allegations, the plaintiff filed suit in New Mexico, asserting claims of defamation, fraud, and interference with beneficial contractual relations.

Though Parry is correct that the court in *Radford* found that these facts did not give rise to the requisite nexus between the tortious conduct and New Mexico, he fails to recognize an important distinction. In *Radford*, the contacts directed at the plaintiff in New Mexico and the allegedly tortious conduct were not one and the same. Rather, the court considered the alleged tortious conduct to include that defendant "defamed [plaintiff] to his employer in New York," "fed defamatory information to others (with no particular connection to New Mexico)," "perpetrated a fraud on [plaintiff's] New York employer," "tortiously interfered with [plaintiff's] employment contract with his New York employer," and "attempted to interfere" with other contracts that had no particular connection to New Mexico. *Id.* at *9. According to the court, these "alleged torts in no way connect[ed] Defendant to New Mexico." *Id.* And, echoing *Walden*, the mere knowledge that the out-of-state tortious conduct would harm the plaintiff in New Mexico was not enough to confer jurisdiction. Given that the tortious conduct was not directed toward New Mexico, that "Defendant knew she

26

was defaming a New Mexico resident and, indeed, Plaintiff suffered harm in New Mexico" was not sufficient to show purposeful availment. *Id.* at *8.

Here, though, not only could Parry foresee that his conduct would harm Chulsky in Ohio, but he also knowingly directed the allegedly harmful communications themselves into this State. As noted, that makes this case different from *Radford*. The Sixth Circuit "has long held that the minimum contacts test can be satisfied either by acting *or* the causing of a consequence in the forum state." *Scotts Co.*, 145 F. App'x at 114 n.1 (citation omitted). Although the Court recognizes that "merely causing a consequence" does not "*always* satisf[y] the minimum contacts test," *id.*, the Court concludes that, in the context here, Parry's contacts, and the consequences flowing therefrom, are enough. Indeed, as the Sixth Circuit has observed: "When the actual content of the communications into the forum gives rise to an intentional tort action, that alone may constitute purposeful availment." *Neal*, 270 F.3d at 332.

In sum, the Court finds that Chulsky has sufficiently alleged Parry's purposeful availment of Ohio. She alleges that Parry engaged in an extended course of tortious conduct directed toward an Ohio resident, with knowledge that such conduct would cause harm to Chulsky and her Ohio-based employment. This satisfies *Southern Machine*'s first prong.

### b. Chulsky's Claims "Arise From" Parry's Ohio Contacts.

Classically, the second prong of the *Southern Machine* test asks whether the cause of action asserted "arise[s] from the defendant's activities" in the forum state.

27

*Southern Mach. Co.*, 401 F.2d at 381. However, the Sixth Circuit has articulated the standard "in a number of different ways, such as whether the causes of action were 'made possible by' or 'lie in the wake of' the defendant's contacts, or whether the causes of action are 'related to' or 'connected with'" those contacts. *Air Products*, 503 F.3d at 553 (citations omitted). Whatever the formulation, this "arising from" test is a "lenient standard." *Id.* (citing *Bird*, 289 F.3d at 875).

Given the Court's conclusion regarding Ohio's long-arm statute, it should come as no surprise that the Court also finds Chulsky's claims "arise from" Parry's Ohio-directed communications from a due process perspective.[11] Here, Chulsky asserts claims against Parry for employment discrimination under Ohio Rev. Code §§ 4112.02(A) and (J). The Court readily concludes that those claims "arise from," are "made possible by," or "lie in the wake of" Parry's visits to Ohio and his Ohio-directed communications with Chulsky. Indeed, analysis of Parry's communications to Chulsky would form an indispensable part of any merits-based consideration of her claims.

---

[11] The Sixth Circuit suggested in *Brunner v. Hampson*, 441 F.3d 457, 466–67 (6th Cir. 2006), and cited approvingly in *Burnshire*, 198 F. App'x 425, 430 (6th Cir. 2006), the notion that this prong of the due process inquiry requires only a "but-for" relationship, while Ohio's long-arm statute requires a more restrictive proximate cause relationship. The court in *Burnshire*, having concluded that the contacts in that case satisfied Ohio's long-arm statute, thus found it unnecessary to conduct the parallel due process analysis. *Id.* at 432 n.2. However, the Sixth Circuit appears to have since walked back its broad view of "arising from," concluding in *Beydoun*, 768 F.3d at 507–08, that "more than mere but-for causation is required to support a finding of personal jurisdiction. To the contrary, the plaintiff's cause of action must be proximately caused by the defendant's contacts with the forum state." In any case, this causal relationship as a constitutional requirement is certainly no *more* restrictive than that required by Ohio's long-arm statute.

Parry again argues that Chulsky's cause of action arises from alleged contacts Parry had with *Chulsky*, but not from the "limited" contacts he had with Ohio before their relationship began. However, as described above, his contacts with Chulsky are not immunized from the Court's consideration simply because he utilized electronic means to contact her from outside the state while she was in Ohio. That is, his physical absence from Ohio does not control. Courts have long found the Due Process Clause "sufficiently flexible to permit suits against defendants who commit torts remotely with the aid of new technology." *Crum v. Est. of Mayberry*, No. CIV. 14-84-ART, 2014 WL 7012122, at \*4 (E.D. Ky. Dec. 11, 2014) (citing *Burger King*, 471 U.S. at 476). The Court finds this true here, as well.

### c. The Court's Exercise Of Personal Jurisdiction Over Parry Is Reasonable.

The Court now turns to the third *Southern Machine* prong. *See LAK, Inc. v. Deer Creek Enters.*, 885 F.2d 1293, 1303 (6th Cir. 1989) ("[E]ach [*Southern Machine*] criterion represents an independent requirement, and failure to meet any one of the three means that personal jurisdiction may not be invoked."). This prong requires that the defendant have a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant "reasonable." *See Southern Mach. Co.*, 401 F.2d at 381. But in making that determination, the Court starts with a presumption. According to the Sixth Circuit, where the first two prongs of the *Southern Machine* inquiry are met, "an inference arises that the third, fairness, is also present; only the unusual case will not meet this third criterion." *First Nat. Bank of Louisville v. J.W. Brewer Tire Co.*, 680 F.2d 1123, 1126 (6th Cir. 1982) (citing

29

*Southern Mach. Co.*, 401 F.2d at 384). In the Court's view, this case is not so unusual as to overcome this inference.

The Supreme Court has articulated several factors a court should consider in determining "reasonableness": (1) the burden on the defendant, (2) the forum state's interest in adjudicating the dispute, (3) the plaintiff's interest in obtaining convenient and effective relief, (4) the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and (5) the shared interest of the States in furthering fundamental substantive social policies. *Burger King*, 471 U.S. at 477 (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 292 (1980)).

As to the first prong, Parry argues, and the Court concedes, that litigating in Ohio would cause Parry no small inconvenience. Parry specifically notes the cost of traveling to Ohio from Utah for depositions and trial. However, parties now routinely conduct depositions remotely via videoconferencing technology, and courts likewise utilize such technology for oral arguments, evidentiary hearings, and even mediation discussions. Second, Ohio has a strong interest in adjudicating the dispute; not only does it involve an Ohio resident, but it alleges violation of Ohio's employment discrimination statute. Third, Chulsky has an interest in obtaining convenient and effective relief, and Ohio presents her best chance of that. Although it is perhaps possible that she could reach both Parry and Golden Corral in another jurisdiction, this does not overcome the presumption of reasonableness. The fourth and fifth factors also weigh slightly in favor of exercising jurisdiction. Indeed, no other state

can claim an interest comparable to Ohio's interest in vindicating the policy choices of its legislature. Moreover, litigating this matter piecemeal (e.g., an action against Golden Corral here and an action against Parry elsewhere) would serve little purpose given the intertwined nature of the underlying facts.

In sum, exercising personal jurisdiction over Parry comports with the requirements of due process, and the Court therefore **DENIES** his Motion (Doc. 18) in that regard.

## B. The Court Denies Parry's Motion To Dismiss For Insufficiency of Service of Process.

Separately, Parry argues that the Complaint must be dismissed as to him because Chulsky failed to serve Parry for approximately ten months after the Complaint was filed. (Mot., Doc. 18, #88–89). The Court disagrees.

To be sure, Fed. R. Civ. P. 4(m) provides that, "[i]f a defendant is not served within 90 days after the complaint is filed, the court … must dismiss the action without prejudice against that defendant or order that service be made within a specified time." Here, Parry was not served within the specified time period. However, Rule 4(m) goes on to state that a court "*must* extend the time for service for an appropriate period" if the plaintiff shows good cause for the failure to serve. Moreover, "courts have been accorded discretion to enlarge the [90]–day period 'even if there is no good cause shown.'" *Henderson v. United States*, 517 U.S. 654, 662–63 (1996) (citing Advisory Committee's Notes on Fed. R. Civ. P. 4, 28 U.S.C. App., at 654). The Federal Rules do not define "good cause," but the Sixth Circuit has required "at least excusable neglect." *Stewart v. Tennessee Valley Auth.*, 238 F.3d 424 (6th Cir. 2000)

(Table). Whether neglect is "excusable" is an equitable determination, which considers "all relevant circumstances surrounding the party's omission." *Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship*, 507 U.S. 380, 395 (1993).

While the ten-month delay between filing of the Complaint and service on Parry in this case is admittedly significant, the Court concludes that any neglect in perfecting service earlier is at least "excusable." Chulsky sent a copy of the Complaint, Summons, and a Waiver of Service of Summons to Parry's last known address around the same day the Complaint was filed. Upon Parry's failure to respond or otherwise appear, Chulsky hired a process server, who was unable to locate Parry. Chulsky's counsel then asked Golden Corral for Parry's updated address, but determined that the address Golden Corral provided corresponded to a business park in St. George, Utah. A few months later, plaintiff's counsel purchased a service with more robust search capabilities, discovered a new residential address for Parry, and successfully served Parry within a few weeks. In sum, Chulsky did not sit idly by during the ten-month delay, but rather made good-faith efforts to locate and serve Parry. Moreover, Parry does not argue that this delay has prejudiced his defense in any way.

Although the Court recognizes that the Federal Rules of Civil Procedure prescribe certain time limits for maintenance of a civil action, the Court also notes that the Rules embody a strong presumption in favor of deciding matters on the merits. *See Foman v. Davis*, 371 U.S. 178, 181 (1962) ("It is … entirely contrary to the spirit of the Federal Rules of Civil Procedure for decisions on the merits to be

32

avoided on the basis of [] mere technicalities."); *cf. Thacker v. City of Columbus*, 328 F.3d 244, 252 (6th Cir. 2003) ("[Fed. R. Civ. P.] 15 is intended to reinforce the principle that cases should be decided on their merits and not merely upon the technicalities of the pleadings.") (citation omitted). Parry has now received the summons, has appeared, and is actively defending himself. The Court declines to dismiss the Complaint because of an excusable delay in service which does not appear to have in any way prejudiced Parry. The Court thus **DENIES** Parry's Motion (Doc. 18) in this regard.

## C.    The Court Grants Parry's Motion To Dismiss For Failure To State A Claim, But Does So Without Prejudice.

Having concluded that the Court may properly exercise personal jurisdiction over Parry and that Chulsky's delay in service does not merit dismissal, the Court turns to the merits of Chulsky's Complaint. On this point, Parry argues that Chulsky's Ohio state law claims against him fail as a matter of law. Those claims, alleging employment discrimination, arise under Ohio Rev. Code § 4112.02, and appear to invoke two distinct subsections: §§ 4112.02(A) and (J).[12] Subsection (A) makes it unlawful for any "employer" to discriminate against a person with respect to the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," on the basis of (among other things) that person's

---

[12] The Complaint alleges claims against Parry under both federal and state antidiscrimination statutes. However, Chulsky withdrew the federal claims (as against Parry) in the course of briefing. (*See* Resp., Doc. 21, #128 n.2 ("Ms. Chulsky concedes that Mr. Parry cannot be held personally liable under Title VII.")). This section of the Opinion is thus directed only at Chulsky's claims against Parry arising under Ohio Rev. Code § 4112.

sex. Ohio Rev. Code § 4112.02(A). Subsection (J), meanwhile, makes it unlawful for a "person to aid, abet, incite, compel, or coerce the doing of any act" prohibited by § 4112.02, and also prohibits any person from attempting, directly or indirectly, to commit any act prohibited by § 4112.02.

The Ohio Supreme Court has recognized that a violation of Ohio Rev. Code § 4112.02(A)'s prohibition of discrimination "because of … sex" may take either of two forms: "(1) 'quid pro quo' harassment, i.e., harassment that is directly linked to the grant or denial of a tangible economic benefit, or (2) 'hostile environment' harassment, i.e., harassment that, while not affecting economic benefits, has the purpose or effect of creating a hostile or abusive working environment." *Hampel v. Food Ingredients Specialties, Inc.*, 729 N.E.2d 726, 732 (Ohio 2000). Chulsky alleges both forms of discrimination based on Parry's conduct. (Compl., Doc. 1, #6–8).

### 1. Chulsky's Complaint Fails To State A Claim Against Parry Under Ohio Revised Code § 4112.02(A).

Without differentiating between Chulsky's "hostile work environment" and "quid pro quo" theories, Parry argues that subsection (A) does not apply to him because it limits liability to "employers." *See* Ohio Rev. Code § 4112.02 ("It shall be an unlawful discriminatory practice: (A) For any *employer* … to discriminate against [a] person ….") (emphasis added). This limitation, he says, is a legislative choice that courts (both Ohio and federal) have interpreted to preclude liability for individual employees. (Mot., Doc. 18, #86–87 (citing, e.g., *Gibbs v. Meridian Roofing Corp.*, No.

1:17-CV-245, 2017 WL 6451181, at *5 (S.D. Ohio 2017); *Hauser v. City of Dayton Police Dep't*, 17 N.E.3d 554 (Ohio 2014)).[13]

Chulsky responds that the Ohio Supreme Court explicitly held otherwise in *Genaro v. Cent. Transp., Inc.*, 703 N.E.2d 782 (Ohio 1999). There is little doubt that *Genaro* lends strong support to Chulsky's position. Answering a certified question from the Northern District of Ohio, Ohio's highest court unambiguously stated that, for purposes of Ohio Rev. Code § 4112, "individual supervisors and managers are accountable for their own discriminatory conduct occurring in the workplace environment," and therefore "may be held jointly and/or severally liable with [the] employer" for that conduct. *Id.* at 787–88.

---

[13] The Ohio General Assembly recently amended Chapter 4112, which now appears to explicitly preclude personal liability for "supervisor[s], manager[s], [and] other employee[s]" unless that supervisor, manager, or employee is, in fact, the "employer." Ohio Rev. Code § 4112.08 (effective Apr. 15, 2021) ("[N]o person has a cause of action or claim based on an unlawful discriminatory practice relating to employment described in division (A)(24)(a) of section 4112.01 of the Revised Code against a supervisor, manager, or other employee of an employer unless that supervisor, manager, or other employee is the employer."); *see also* Sub. H.B. 352, 133d Gen. Assemb. (Ohio 2020).

The alleged discriminatory conduct at issue here (and the briefing directed at Parry's Motion to Dismiss) occurred well before the effective date of the amendment described above. As such, the parties did not address the effect, if any, the amendment to Chapter 4112 has on the viability of Chulsky's claims here—for example, whether the amendment might apply retroactively to bar Chulsky's individual liability claim against Parry. The Court notes that at least two federal courts have concluded that the amendment does not have retroactive effect. *See Williams v. Barton Malow Co.*, No. 3:20-CV-02594-JGC, 2022 WL 189964, at *2–3 (N.D. Ohio Jan. 21, 2022); *Whitman v. Int'l Paper Co.*, No. 5:20-CV-02781, 2021 WL 2581566, at *3 n.1 (N.D. Ohio June 23, 2021). But, because the Court determines that Chulsky's claims fail even under the previous version of the statute, the Court need not (and does not) decide that precise issue. Should Chulsky seek leave to re-plead her claims, though, the parties may wish to address the issue of retroactivity, i.e., whether the amendment precludes Chulsky from re-filing her individual liability claim against Parry.

That being said, fifteen years later the Ohio Supreme Court created some confusion by holding that subsection (A) does "not expressly impose civil liability on political-subdivision employees so as to exempt them from immunity under [Ohio Rev. Code §] 2744.03(A)(6)(c), but rather subject[s] a political-subdivision employer to vicarious liability for the discriminatory acts of its employees." *Hauser*, 17 N.E.3d at 559. *Hauser* took pains to avoid expressly overruling *Genaro*, though, distinguishing the previous case on the ground that *Genaro* concerned only *private*-sector employees, while *Hauser* dealt with statutory immunity afforded to political-subdivision employees. *Id.* At the same time, however, the *Hauser* court conceded that its decision "call[ed] … into question" *Genaro*'s reasoning. *Id.*

In the wake of *Hauser* (but prior to the recent amendment to Ohio Rev. Code § 4112 described *supra*, note 13), federal courts in Ohio took varying approaches to this apparent tension. Some courts concluded that *Genaro* no longer controlled, even in cases involving private-sector employers, supervisors, and managers. *See Parker v. Strawser Constr., Inc.*, 307 F. Supp. 3d 744, 752 (S.D. Ohio 2018); *Gibbs*, 2017 WL 6451181, at *5. Other courts expressed doubt about the continued validity of *Genaro* in light of *Hauser*, without necessarily deciding the question. *See Morningstar v. Circleville Fire & EMS Dep't*, No. 2:15-CV-3077, 2018 WL 1365842, at *9 (S.D. Ohio Mar. 16, 2018); *Longoria v. Autoneum N. Am., Inc.*, No. 3:14CV2648, 2015 WL 6658675, at *5 (N.D. Ohio Oct. 30, 2015). And at least two courts reiterated the vitality of *Genaro*, at least with respect to private-sector, supervisory employees. *See Musarra v. Univ. Hosps. Physician Servs., Inc.*, No. 1:18CV959, 2019 WL 315056, at

36

*3 (N.D. Ohio Jan. 24, 2019) ("[A] careful reading of *Hauser* reveals that the decision merely created an exception that applies when the immunity provision in [Ohio Rev. Code §] 2744.03(A)(6)(c) is invoked."); *Lee v. Air*, No. 1:20 CV 491, 2020 WL 2770039, at *2 (N.D. Ohio May 28, 2020) ("[S]upervisors may be individually liable for alleged violations of the employment discrimination provisions of the Ohio statute ….").

Having considered *Genaro* and *Hauser*, the varied approaches of other district courts, and the statutory language, the Court is convinced that *Genaro*'s interpretation of § 4112.02(A) remains (or, rather, remained at the time that the events at issue here occurred) good law as to private-sector supervisory employees. While *Hauser* cast some "doubt" on *Genaro*'s reasoning, it takes more than an expression of "doubt" to overrule a past decision of the same court, and the *Hauser* court explicitly declined to take that additional step. Several Ohio appellate courts have come to that same conclusion in recent years. *See Tanksley v. Howell*, No. 19AP-504, 2020 WL 5203568, at *4 n.1 (Ohio Ct. App. Sept. 1, 2020) ("Although some federal courts have called the validity of *Genaro* into question following *Hauser*, *Genaro* remains binding authority on this court."); *Fry v. Wheatland Tube, LLC*, 135 N.E.3d 420, 431 (Ohio Ct. App. 2019) ("The Ohio Supreme Court held in *Genaro* … that supervisors and managers may be held personally liable for unlawful discriminatory acts committed by such persons in violation of [Ohio Rev. Code] Chapter 4112."). These state court decisions are particularly persuasive because, when uncertain how a state's highest court might rule on an issue of state law, a federal court is bound to make an "*Erie* guess" based on, among other things, the decisions of the state's

intermediate courts. *See Stoner v. New York Life Ins. Co.*, 311 U.S. 464, 467 (1940) ("[F]ederal courts, under the doctrine of *Erie* ... must follow the decisions of intermediate state courts in the absence of convincing evidence that the highest court of the state would decide differently.").

The determination that *Genaro* controls, however, leads directly to another question, one on which Chulsky fares less favorably. In particular, even under *Genaro*, it is not *any* employee who may be held jointly liable with the employer for his or her own discriminatory conduct; rather, individual liability attaches only to "supervisors and managers." *Genaro*, 703 N.E.2d at 787; *see also Fry*, 135 N.E.3d at 431 ("The issue of whether Hoffman was Fry's supervisor is first relevant to the issue of whether Hoffman is individually liable … under [Ohio Rev. Code] Chapter 4112."). And here, Chulsky has failed to adequately allege that Parry was her "supervisor" as Ohio courts have used that term.

In the words of one Ohio appellate court, a "supervisor" for purposes of individual liability under Chapter 4112 is one who is "'*empowered by the employer* to take tangible employment actions against the victim,' which means 'to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.'" *Fry*, 135 N.E.3d at 432 (quoting *Holland v. Mercy Health*, No. 3:18-CV-490, 2018 WL 6041359, at *8 (N.D. Ohio Nov. 19, 2018)) (emphasis added) (noting further that "[f]ederal cases applying Title VII are generally applicable to cases involving" Ohio Rev. Code Chapter 4112 (citing *Genaro*, 703

38

N.E.2d 782)). The Complaint fails to plausibly allege that Parry meets that standard here. To be sure, in the Complaint, Chulsky avers that Golden Corral employed Parry "as a corporate director and supervisor as that term is used and applied by O.R.C. 4112.02." (Compl., Doc. 1, #3). But that allegation is a legal conclusion, not a factual assertion, and therefore does not assist Chulsky in meeting the federal pleading standards necessary to sustain her claim under § 4112.01(A). *See Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555).

The only non-conclusory factual allegations in the Complaint bearing on Parry's alleged supervisory status are: (1) that he was a "Quality Assurance Director," a position which apparently empowered him to conduct inspections of various Golden Corral facilities, including the one at Eastgate (*see* Compl., Doc. 1, #4); (2) that he used "his position and authority" over Chulsky as leverage to maintain the relationship and dissuade Chulsky from reporting his conduct, including by telling Chulsky that his influence had, in the past, prevented another female employee from reporting a different male employee's harassment (*id.* at #5); and (3) that he threatened to "destroy" Chulsky if she considered speaking to management (*id.*).

Although these allegations allow the Court to infer that Parry occupied a position somewhere higher on the corporate ladder than Chulsky and, perhaps, that Parry therefore had some amount of influence within the company, they fail to allege that Golden Corral empowered Parry "to take tangible employment actions against" Chulsky, such as hiring, firing, reassignment, or the like. As such, these allegations are also insufficient. *See Holland*, 2018 WL 6041359, at *9 (refusing to impose

39

individual liability under Chapter 4112 where plaintiff made "no non-conclusory allegations that either defendant could fire, demote, or reassign" the plaintiff, despite that one of the defendants was CEO).

In fairness to Chulsky, it may not be necessary that Parry have *in fact* held the power to terminate or otherwise tangibly affect the terms of her employment—i.e., that Golden Corral gave him "actual" authority to do so. That is, to the extent that Chapter 4112 reflects traditional principles of agency law, one might consider her theory to be one of "apparent" agency. For example, Chulsky alleges that she remained silent for a time because of Parry's "insinuations of reprisal" which she considered to include "jeopardizing her employment." (Compl., Doc. 1, #5). Taking this allegation in a light most favorable to Chulsky, it certainly suggests that Parry at least *claimed* to have the power to take an adverse action against her.

However, to the extent that "apparent" authority could suffice to create individual liability under subsection (A), Chulsky fails to plausibly allege apparent authority here. The purported agent, after all, cannot create an "apparent" agency relationship of his or her own accord; rather, such authority arises only through the *principal's* conduct. *Scott v. Kindred Transitional Care & Rehab.*, No. 103256, 2016 WL 561756, at *3 (Ohio Ct. App. Feb. 11, 2016) ("[U]nder an apparent-authority analysis, it is the acts of the principal, not … the agent[], that create apparent authority. The principal is responsible for the agent's acts only when the principal has clothed the agent with apparent authority and not when the agent's own conduct has created the apparent authority.") (internal quotation marks and citation

omitted). Here, the principal is Golden Corral. And the Court finds no allegations in the Complaint suggesting that Golden Corral communicated anything to Chulsky that "clothed" Parry with apparent authority over her. Again, the only allegations even gesturing in that direction are that Golden Corral placed Parry in the position of "Quality Assurance Director" and empowered him to conduct facility inspections. The Court finds those allegations insufficient, without more, to create the appearance that Parry had authority to hire, fire, or demote Chulsky, or otherwise change her employment status.

Because Chulsky has failed to adequately allege that Parry was her "supervisor" as Ohio courts apply that term to Chapter 4112, Parry cannot be held individually liable under Ohio Rev. Code § 4112.02(A), and thus Chulsky's claims against him for hostile work environment and quid pro quo sexual harassment, as currently alleged, fail as a matter of law under that subsection.

### 2. Chulsky's Complaint Fails To State A Claim Against Parry Under Ohio Rev. Code § 4112.02(J).

Parry likewise insists that Chulsky fails to state a claim against him under subsection (J). In pressing that argument, Parry does not dispute, nor could he, that subsection (J) provides for individual liability. *See Hauser*, 17 N.E.3d at 558 ("[Ohio Rev. Code § 4112.02(J)] already holds individual employees liable for their participation in discriminatory practices."); *Vandiver v. Morgan Adhesive Co.*, 710 N.E.2d 1219, 1224 (Ohio Ct. App. 1998) ("[B]oth [Ohio Rev. Code §§] 4112.02(I) and (J) apply to 'any person' who violates them. [Ohio Rev. Code §] 4112.01(A)(1) defines 'person' as 'one or more individuals' ...."). Instead, Parry argues that the Court must

dismiss Chulsky's claims under subsection (J), as that subsection provides for "aiding and abetting" liability, and here, according to Parry, Chulsky fails to allege that Parry "aided, abetted, incited, compelled, or coerced *Golden Corral* to discriminate against [Chulsky]." (Reply, Doc. 22, #142 (emphasis in original)).

Parry's argument starts on solid legal footing. According to Ohio courts, "the language of sub-section (J) bases a person's liability on actually 'facilitat[ing]' *another's* active violation of [Ohio Rev. Code §] 4112.02." *Pittman v. Parillo*, No. L–16–1140, 2017 WL 1422891 at *18 (Ohio Ct. App. Apr. 21, 2017) (quoting *Cole v. Seafare Enters.*, No. C–950157, 1996 WL 60970, at *3 (Ohio Ct. App. Feb. 14, 1996)) (emphasis added). It is an "aiding and abetting" provision, after all. To determine Parry's derivative liability under 4112.02(J), then, one must first consider the nature of the "primary" violation from which his liability allegedly derives. That is, Chulsky must allege that Parry facilitated Golden Corral's active violation of Chapter 4112.

Here, though, the only allegations directed at Golden Corral are that Golden Corral failed to discipline Parry once Chulsky reported his conduct. (Compl., Doc. 1, #6). To the extent that this allegation states a claim for employment discrimination against Golden Corral (a question not currently before the Court),[14] it nevertheless

---

[14] To establish a claim of hostile work environment sexual harassment, Chulsky must show:

> (1) that the harassment was unwelcome, (2) that the harassment was based on sex, (3) that the harassing conduct was sufficiently severe or pervasive to affect the "terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment," and (4) that either (a) the harassment was committed by a supervisor, or (b) the employer, through its agents or supervisory personnel, knew or should have known of the harassment and failed to take immediate and appropriate corrective action.

fails to state a claim against Parry. That is because, while Parry of course *may* have played a part in Golden Corral's decision not to discipline him—which is Golden Corral's only alleged misconduct here—Chulsky levies no factual allegations suggesting that he in fact *did*. Chulsky does not allege, for example, that Parry participated in a meeting at which he and others decided that Golden Corral should not further investigate Chulsky's claims, or decided that Golden Corral should absolve Parry of any responsibility for his actions.

Instead, Chulsky argues it is enough that Parry "knowingly [did] something which he ought not to do … which assist[ed] or tend[ed] in some way to affect the doing of the thing which the law forbids." (Resp., Doc. 21, #130 (quoting *Luke v. City of Cleveland*, No. 1:02CV1225, 2005 WL 2245187, at *8 (N.D. Ohio Aug. 22, 2005))). On that front, Chulsky is perhaps correct that Parry's harassment "tended … to affect" Golden Corral's ultimately prohibited conduct. After all, but for Parry's harassment, Golden Corral's failure to act would not (even allegedly) violate subsection (A). But more is required to establish an aiding and abetting claim. In particular, federal courts in Ohio have interpreted 4112.02(J) to provide for individual liability where an employee was "involved in or actually … made *the [company's] decision* to [discriminate or] retaliate against [the plaintiff]." *Evans v. Hillman Grp., Inc.*, No. 1:20CV41, 2021 WL 1140100, at *5 (S.D. Ohio Mar. 25, 2021)

---

*Fry*, 135 N.E.3d at 431. Chulsky's allegation that Golden Corral failed to take disciplinary action is directed toward the fourth element's latter option: that the employer knew or should have known about the harassment and failed to take corrective action. The Court need not separately analyze Chulsky's claim for "quid pro quo" sexual harassment under subsection (J) because her allegation in that regard appears directed only at Parry, as opposed to implicating any action (or inaction) on the part of Golden Corral. (*See* Compl., Doc. 1, #7–8).

(quoting *Oster v. Huntington Bancshares Inc.*, Case No. 2:15-CV-2746, 2017 WL 2215462, at *22 (S.D. Ohio May 19, 2017)) (emphasis added). Here, as noted above, Chulsky has not alleged that Parry was "involved in or actually made" that decision. Thus, her claim fails.

Chulsky points to her allegation that "Parry told Ms. Chulsky he would 'destroy' her if she reported his conduct to Golden Corral." (Compl., Doc. 1, #131). If this is meant to imply that Parry actively participated in Golden Corral's decision to forgo corrective action, though, this allegation, in and of itself, is insufficient to push that implication from the realm of "possibility" to "plausibility." *See Darby v. Childvine, Inc.*, 964 F.3d 440, 444 (6th Cir. 2020) (citing *Twombly*, 550 U.S. 544, 570 (2007)). To be sure, Parry may have *claimed* that he had the ability to control that decision, but Chulsky offers no factual allegations in her Complaint that make it plausible to conclude either that Parry *in fact* had that power, or that he exercised it to control the decision here.

Finally, Chulsky points to other language in subsection (J) that makes it unlawful to "to attempt directly or indirectly to commit any act declared by this section to be an unlawful discriminatory practice." Ohio Rev. Code § 4112.02(J). She argues that Parry "did attempt directly to commit an act declared by [Ohio Rev. Code] § 4112.02 to be an unlawful discriminatory practice—sexual harassment and gender discrimination." (Resp., Doc. 21, #131).

The "attempt" language does muddle things a bit. Overall, subsection (J) is understood as a derivative liability section (i.e., it provides for liability against those

44

who assist *another* in a violation). But the statutory language directed at attempts does not easily fit within that context. It appears to provide liability against an individual for "attempting" to do something, whether or not another individual was involved. And case law does not help much either, as the parties failed to supply— and the Court failed to identify—any case in which a court imposed individual liability under (J) based on an individual defendant "attempting" (on his or her own) rather than "aiding or abetting" (another).

That being said, the Court concludes that this language will not support Chulsky's argument here. Consider the context. As a general matter, Ohio's statutory discrimination laws are construed to match federal discrimination law. *See Fry*, 135 N.E.3d at 432 (citing *Genaro*, 703 N.E.2d 782). The latter provides for liability only as against *employers*, and not as against individuals. *Alexander v. Univ. of Memphis*, No. 20-5426, 2021 WL 2579973, at *3 (6th Cir. June 7, 2021) ("[A]n individual cannot be held personally liable for violations of Title VII." (quoting *Griffin v. Finkbeiner*, 689 F.3d 584, 600 (6th Cir. 2012))). That is, Title VII would not provide individual liability against a co-worker, or even a supervisor, who engaged in sexual harassment. Rather, the liability, if any, would run only to the employer. To be sure, the offending employee may be civilly liable on *other* theories, such as assault, or battery, or intentional infliction, and may even face criminal liability (all depending on the facts, of course), but the offending employee would not face individual liability under Title VII.

Ohio changed that result somewhat. Specifically, the Ohio Supreme Court in *Genaro* extended individual liability to any "supervisors and managers" who personally participated in the discriminatory conduct. *Genaro*, 703 N.E.2d at 787–88. But, in doing so, the *Genaro* court did not extend the statute to other co-workers. And the Court has already concluded above that Parry does not qualify (at least on the allegations here) as a "manager" or "supervisor."

Reading subsection (J) in the manner Chulsky urges here—where *any* individual who personally attempts to participate in wrongful conduct would face individual liability under that latter subsection—would extend individual liability far beyond the limited extension that the Ohio Supreme Court adopted in *Genaro*. Especially in light of *Hauser* (and the General Assembly's recent amendment of Chapter 4112 described above, further restricting individual liability), the Court concludes that the Ohio Supreme Court would not be inclined to expand such liability in the manner that Chulsky suggests.

A close reading of the statutory text of subsection (J) strongly suggests the same result. To be sure, the "attempt" clause of subsection (J) provides liability for individuals, but only those individuals who "attempt ... to commit ... an unlawful discriminatory practice." Ohio Rev. Code § 4112.02(J). The phrase "unlawful discriminatory practice," though, as relevant here, refers to an "employer['s]" conduct "with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment." Ohio Rev. Code § 4112.02(A). Because Parry is not an "employer" (nor a manager or supervisor, as discussed above),

his acts, even if completed, would not fall within subsection (A), and thus any "attempts" to engage in that same conduct would not fall within (J).

And, in the hostile work environment setting, i.e., where the victim's claim is that co-workers were making work conditions intolerable on forbidden grounds (such as sex, race, or age), the "unlawful discriminatory practice" arises from the employer's failure to ameliorate the situation once on notice of it. That is, the "unlawful discriminatory practice" under the statute is not the co-workers' conduct itself, but rather the employer's failure to intervene to prevent or correct that conduct. *See, e.g.*, *Chapa v. Genpak, L.L.C.*, No. 12AP–466, 2014 WL 1347980, at *16 (Ohio Ct. App. Mar. 11, 2014) ("[A]n employer may be liable for a *co-worker's* harassment of an employee when the employer knew or should have known of the charged harassment and failed to implement prompt and appropriate action.") (emphasis added). Once again, then, any "attempt" relating to this "discriminatory practice" would extend only to Parry's efforts to involve himself in that failure to intervene, e.g., in attempting to prevent Golden Corral from taking action, and, even then, only so far as Parry is a "supervisor" or "manager."[15]

To summarize, Chulsky has failed to adequately allege that Parry is liable for employment discrimination under 4112.02(A) as a supervisor, or under 4112.02(J) for

---

[15] The only other subsection in § 4112.02 which allows for individual liability is § 4112.02(I), which makes it unlawful to discriminate against a person because that person has "opposed" an unlawful practice described in § 4112.02 or "because that person has made a charge, testified, assisted, or participated in any manner in any investigation, proceeding, or hearing under sections 4112.01 to 4112.07 of the Revised Code." Chulsky does not press this theory, and it would fail even if she did. That is because she has not alleged that she participated in a hearing in any way, nor has she alleged that Parry discriminated against her "because" of that participation.

having "aid[ed], abet[ted], incite[d], compel[led], or coerce[d]" Golden Corral's violation of Ohio Rev. Code Chapter 4112, or for having "attempted" to do so. As such, these claims against Parry must be dismissed. Again, in reaching that result, the Court does not reject the notion that, on the allegations here, Parry could perhaps be liable under some *other* theory. Rather, the Court's point is merely that, as a general matter, individual liability for discriminatory practices under Ohio Rev. Code § 4112 extends only to a few limited categories of individuals, and Chulsky has not plausibly alleged that Parry falls within any of those categories here.

That leaves the remaining question of whether that dismissal should be with or without prejudice. On that front, as noted above, the Court has determined that Chulsky's claims against Parry are legally defective as currently pled. But that is not to say that Chulsky could not rectify the identified shortcomings with additional factual allegations. That is, nothing in the Court's decision forecloses Chulsky from pursuing the claims as a matter of law. For example, if Chulsky can allege facts, consistent with Rule 11, that Golden Corral had in fact given Parry authority to hire or fire Chulsky, or alter the terms of her employment, that may suffice. As things stand, though, Chulsky has not yet met the plausibility threshold. Accordingly, the Court will dismiss Chulsky's claims, but will grant her thirty-days to seek leave to file an amended complaint that addresses, to the extent that the facts allow, the shortcomings identified above.

## CONCLUSION

For the foregoing reasons, the Court **GRANTS** Parry's Motion to Dismiss (Doc. 18) Chulsky's Complaint (Doc. 1) for failure to state a claim. The Court therefore **DISMISSES** Chulsky's claims against Parry, but does so **WITHOUT PREJUDICE**. The Court further **GRANTS** Chulsky **THIRTY-DAYS' LEAVE** to move to file an amended Complaint correcting the pleading deficiencies, if she can.

**SO ORDERED.**

February 1, 2022
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**